# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Ronald A. Guzman | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 3390 | **DATE** | 7/23/2002 |
| **CASE TITLE** | MIKE HOULIHAN vs. MALACHY McCOURT, et al | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] ENTER MEMORANDUM OPINION AND ORDER: Plaintiff's motion for summary judgment is granted as to Count I on liability only and denied as to Counts II, III and IV [32-1]. Defendants' cross motion for summary judgment as to Counts II, III and IV of plaintiff's complaint is granted. Plaintiff's motion for summary judgment regarding defendants' affirmative defenses and counterclaim is denied [31-1]. This case is scheduled for a settlement conference on 8/19/02 at 2:00p.m. in chambers 1278. The parties are to refer to Judge Guzman's website for more information.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | **Document Number** |
| | No notices required. | number of notices | | |
| | Notices mailed by judge's staff. | JUL 29 2002 | | 53 |
| | Notified counsel by telephone. | date docketed | | |
| ✓ | Docketing to mail notices. | | | |
| | Mail AO 450 form. | docketing deputy initials | | |
| | Copy to judge/magistrate judge. | | | |
| | | date mailed notice | | |
| TBK | courtroom deputy's initials | | | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MIKE HOULIHAN, d/b/a BLAGUARDS )
PRODUCTIONS, )
)
)
Plaintiff, )
)
v. )
)
MALACHY McCOURT and FRANK )
McCOURT, )
)
Defendants. ) No. 00 C 3390
)
————————————————— )
) Judge Ronald A. Guzman
MALACHY McCOURT and FRANK )
McCOURT, )
)
Counter-Plaintiffs, )
)
v. )
)
MIKE HOULIHAN, d/b/a BLAGUARDS )
PRODUCTIONS, )
)
Counter-Defendants. )

## MEMORANDUM OPINION AND ORDER

Pending are cross motions for summary judgment pursuant to Fed. R. Civ. P. 56. For the reasons set forth below summary judgment is granted in favor of Plaintiff as to liability on Count I only. Defendants' cross motion for summary judgment as to Counts II, III and IV of plaintiff's complaint is granted. Plaintiff's motion for summary judgment on defendants' affirmative defenses is denied as moot.

53

# BACKGROUND FACTS

The following facts are undisputed except where noted. This case concerns the life stories of Frank and Malachy McCourt, Irish American brothers who were born in the United States, moved with their parents to Ireland when they were children, and eventually moved back to the United States when they were older. Their stories are told in the novel Angela's Ashes, by Frank McCourt, which was made into a major motion picture released in 1999 (Def.'s LR 56.1(a)(3) ¶ 12), the novel 'Tis, also by Frank McCourt, and the novel A Monk Swimming, by Malachy McCourt. (Def.'s LR 56.1(a)(3) ¶ 13) ("the Books"). Angela's Ashes describes the first nineteen years of Frank McCourt's life, from his birth in Brooklyn, to his family's emigration to Ireland, and eventually his return to the United States as a young adult. (Def.'s LR 56.1(a)(3) ¶ 14)[1]. 'Tis, published in 1999, describes Frank's life after arriving in America, from his journey as an impoverished immigrant to his eventual success in writing and teaching. (Def.'s LR 56.1(a)(3) ¶ 19-20). A Monk Swimming, by Malachy McCourt, was published in 1998 and traces Malachy's life from his time in Ireland to his escapades in New York City. (Def.'s LR 56.1(a)(3) ¶ 23).

In 1977, long before Angela's Ashes was written, the McCourts, both in America, wrote and began performing the play, A Couple of Blaguards. (Def.'s LR 56.1(a)(3) ¶ 6) ("the Play"). The Play was based largely on the McCourts' childhood and early adult experiences, although

---

[1] Plaintiff objects to Def.'s LR 56.1(a)(3) ¶¶ 14, 20, and 23, which contain descriptions of the contents of the Books, as being opinions, and not facts, inappropriate for LR 56.1. This objection is without merit. Description of the contents of the book is not only appropriate, it is essential to the Court's understanding of the issues involved, as anything less would require the Court to read all three Books in depth, "scour[ing] the record in search of a genuine issue of triable fact," which it is not obliged to do. *Brasic v. Heinemann's, Inc.*, 121 F.3d 281, 285 (7th Cir. 1997). If Plaintiff disagreed with Defendants' description of the contents of the books, he should have said so in his 56.1(b)(3)(A) statement *and* offered an alternative. The Local Rule requires the non-moving party, when disagreeing with the moving party's facts, to provide "specific references to the affidavits, parts of the record, and other supporting materials relied upon." LR 56.1(b)(3)(A). Instead, Plaintiff merely denies and states, "the book speaks for itself." If the book truly speaks for itself, then the issue is indeed factual and should have been replied to. Plaintiff's is an unacceptable response and, therefore, Defendants' LR 56.1(a)(3) ¶¶ 14, 20, and 23 are found to be true, based not only on Plaintiff's inappropriate objection, but this Court's perusal of the books themselves, and the *Angela's Ashes* film.

the defendants maintain it is not a memoir in the same realm as the Books. It is presented through light anecdotes, largely satirical, and is interspersed with Irish songs.

In 1984, the McCourts entered into an agreement with plaintiff Mike Houlihan, giving Houlihan the right to produce the Play. (Def.'s LR 56.1(a)(3) ¶ 28). The agreement was executed in New York, where all the parties resided at the time. (Def.'s LR 56.1(a)(3) ¶ 29). The contract granted Houlihan the rights to produce the play in exchange for one third of the profits earned from productions at the Village Gate Theater in New York City, and 5% of the profits at any other theaters. (Agreement, Pl.'s Exhibit B at 1). In addition to giving Plaintiff the right to produce the play, the contract also contained the following language:

> Producer will be entitled to ... an aggregate share of 40% of the Play's subsidiary rights. Producer's right to share in the Play's subsidiary rights shall extend for 15 years following the close of the last production hereunder and include, but not be limited to worldwide rights, touring rights to the Play, stock and amateur, publication rights, merchandising, motion picture, cable and/or television rights, and record rights.

(Agreement at 1-2) ("the subsidiary rights clause."). The Plaintiff, Mike Houlihan, essentially contends that the subsidiary rights clause entitles him to 40% of the subsidiary rights to Angela's Ashes, including profits from the motion picture, 'Tis, and A Monk Swimming.

The agreement was modified in 1986 as part of a settlement between the parties of a lawsuit involving alleged breach of the production contract, to include a requirement of an accounting of performances of the Play, (Pl's LR 56.1(b)(3)(B) ¶ 21), and giving Houlihan the right to 40% of the 6.5% of the gross weekly receipts of all performances of the Play. (Agreement Amendment, Pl.'s Exhibit C). Plaintiff contends that he has not been paid for numerous performances of the Play since 1986. (Pl's LR 56.1(b)(3)(B) ¶ 22). Defendants contend that this is an "insignificant trifle" and that the performances in question yielded no

profits. Further, Defendants counterclaim that Houlihan, himself breached the production agreement by failing to compensate them for performances of the play, pursuant to the agreement. They also allege that they entered into an oral agreement with Houlihan shortly after the original written agreement in 1984, concerning specific weekly dollar amounts and hotel expenses to be paid. (Answer at ¶ 43), and that this oral agreement was violated as well.

Count I of the plaintiff's complaint seeks an accounting of all performances of and profits from the Play and to obtain 40% of 6.5% of the gross weekly receipts allegedly owed to him under the modified agreement. Counts II-IV ask the Court to find that the Books and any derivatives thereof fall under the subsidiary rights clause of the original agreement and to award him 40% of all royalties received by the McCourts for the Books and the film Angela's Ashes. Defendants deny this alleged breach of contract and assert three affirmative defenses: statute of limitations, waiver, and estoppel Defendants also assert the following counterclaims: two counts of breach of contract (one for the written Agreement and another for an alleged oral agreement), and the other for unjust enrichment as a result of Houlihan benefiting from the play while not paying the McCourts their share owed under the contract.

### DISCUSSION

Under Fed.R.Civ.P. 56, summary judgment is proper when the moving party has established that no genuine issue of material fact requiring resolution at trial exists in the record and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In deciding motions for summary judgment, the Court views all evidence in the light most favorable to the non-moving party, resolving any doubt as to the existence of genuine issues against the moving party. *Valley Liquors, Inc. v. Renfield Importers, Ltd.*, 822 F.2d 656, 659 (7th Cir. 1987). "The evidence of the non-movant is to be believed, and

all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, a party may not rest upon pleadings to oppose a motion for summary judgment and must set forth specific facts showing that there is a genuine issue of material fact for trial. *Id.* at 248.

On cross-motions for summary judgment, the Court should look to the burden of proof that each party would bear on an issue of trial, and then require that party to go beyond the pleadings and affirmatively establish a genuine issue of material fact. *Santaella v. Metropolitan Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir.1997). At trial, the plaintiff would clearly have the burden of proving the counts in his complaint by a preponderance of evidence, and Defendants would have the burden of proving their affirmative defenses. When considering a summary judgment motion by Defendants, however, the Court must place a burden on them higher than at trial, requiring them to prove affirmatively that they are entitled to judgment as a matter of law based on undisputed facts. That standard is not lessened because these are cross-motions for summary judgment; cross-motions for summary judgment are not a waiver of trial. *Miller v. LeSea Broadcasting, Inc.*, 87 F.3d 224 (7th Cir. 1996). Therefore, the appropriate standard for granting summary judgment in Defendants' favor is, in this case, the same as if Defendants' had unilaterally moved for summary judgment. And, necessarily, if Defendants' motion for summary judgment is granted, Plaintiffs' motion for summary judgment must be denied, as Defendants' burden to defeat Plaintiffs' motion would be far less than that required to succeed at their own motion. However, the facts, evidence, and arguments of both Defendants' and Plaintiff's cross-motions shall be considered as a whole in determining whether to grant for one party or the other. Plaintiff has moved for summary judgment as to his complaint and

Defendants' counterclaim. Defendants have cross moved for summary judgment as to Plaintiff's complaint.

## I. Count I – Breach of the Amended Agreement

We must first resolve the threshold issue whether of Plaintiff's breach of contract claim is time barred. The statute of limitations is 10 years, and since the case was filed in June of 2001, any claims prior to June of 1991 are barred. Plaintiff seeks recovery of damages for performances of the Play from December 2, 1986 until June 15, 2000. Applying the statute of limitations performances subsequent to June of 1991 are actionable, whereas performances prior are barred.

The Court is now left in a troubling predicament. The briefing with respect to the parties cross motion for summary judgment on Count I is scarce. The facts presented to the Court on this issue are even scarcer. Only one paragraph (Pl.'s LR 56.1(a)(3) ¶ 22) in the LR 56.1 statements of facts addressed this issue, and it demonstrates nothing except Houlihan's allegation that he is owed money, and the McCourts' response that the money owed is negligible.

With the limited information that the parties have given the Court on Count I, it is apparent that there are twelve alleged performances of the Play, subsequent to the statute of limitations bar of June of 1991, for which Plaintiff has allegedly not been paid. Plaintiff's LR 56.1 Statement of Facts points to the deposition of Malachy McCourt as evidence that Plaintiff has not received an accounting of receipts from performances or the money owed to him for those performances subsequent to 1991. (Pl.'s LR 56.1(a)(3) ¶ 22). The deposition makes clear that for at least some performances subsequent to 1991, Plaintiff was not given an accounting and was not paid the money due him because the shows were unsuccessful. (Malachy Dep. at

76-78; 93-94). Defendants do not even dispute this, but, rather, claim that this is an "insignificant trifle." (Def.'s LR 56.1(b)(3) ¶ 22).

As insignificant a trifle as the money owed may be, a breach of contract is a breach of contract, whether the amount in question is $1 or $1,000,000. Defendants are correct in their assertion that, under both Illinois and New York law, in the absence of a fiduciary relationship, accounting is only available as a remedy if there exists no adequate remedy at law; thus, a request for an accounting and a request for contract damages are mutually exclusive. *3Com Corp. v. Electronics Recovery Specialists, Inc.,* 104 F.Supp.2d 932, 941 (N.D. Ill. 2000); *Leveraged Leasing Admin. Corp. v. PacifiCorp Capital, Inc.,* 87 F.3d 44, 49 (2d Cir. 1996). However, in this case, the contract in question specifically calls for an accounting. Presumably, that provision was added to the contract in order that Houlihan could ascertain the money owed to him. Further, no adequate remedy at law seems available, because all indications are that no one knows for sure which performances made money and which ones did not.

Because Malachy McCourt, in his deposition, admitted failing to account for several performances to Houlihan, summary judgment is granted on Count I in favor of Plaintiff. Defendants are ordered to submit to an accounting as to all performances subsequent to June of 1991. Proof of damages will be conducted subsequent to the accounting.

## II. Counts II, II, IV – Subsidiary Rights to Angela's Ashes, 'Tis, and A Monk Swimming

We now turn to the primary issue in this case, that of Plaintiff's claim to 40% of the profits of Angela's Ashes (book and film) and 'Tis, and A Monk Swimming.

## A.    Choice of Law

The first dispute among the parties is the choice of law to be applied to the subsidiary rights clause of the contract. District Courts in diversity actions are to apply the choice of law rules of the forum state. *Klaxon v. Stentor Electrical Mfg.* Co., 313 U.S. 487, 496 (1941); *Fulcrum Financial Partners v. Meridian Leasing Corp.*, 230 F.3d 1004 (7th Cir. 2000).

Illinois has adopted the test of the Restatement (2nd) of Conflicts, § 188, that is the "most significant relationship" test, for determining the choice of law of a contract when the parties themselves have not chosen. *Palmer v. Beverly Enterprises*, 823 F.2d 1105, 1107 (7th Cir. 1987). That test looks to: a) the place of contracting; b) the place of negotiation of the contract; c) the place of performance of the contract; d) the location of the subject matter of the contract; and e) the domicile, nationality, residence, place of incorporation, and place of business of the parties. Restatement (2nd) of Conflicts § 188. Further, "[t]hese contacts are to be evaluated according to their relative importance with respect to the particular issue." *Id.*

In this case, all the parties resided in New York at the time the initial contract was formed. The contract was negotiated in New York. The initial performance of the contract took place in New York, though once Plaintiff moved to Illinois, where he resided when the Books were published, performance of the contract would have taken place there. The subject matter of the contract was intellectual property, which does not reside at any "place," therefore the fourth factor is not applicable. The final factor does not provide much guidance either, because the parties live in different parts of the country.

Plaintiff suggests that the applicable law is Illinois' because he resided in Illinois at the time of the 1986 amendment. However, the portion of the contract in dispute, the subsidiary rights clause, was negotiated, written, and executed in 1984 and was unmodified by the 1986

amendment. Plaintiff also cites to *Gainer Bank v. Jenkins*, 672 N.E.2d 317, 319 (Ill. App. 3d Dist. 1996) for the proposition that when the ultimate object of a contract is the payment of money, the choice of law for interpreting that contract should be that of the place where payment is made, and since Plaintiff currently resides in Illinois, payment would be made to him in Illinois. However, Gainer Bank deals with contracts for the repayment of money lent, and was governed under the rule of Restatement (2nd) § 195, not § 188. Plaintiff also cites to *DeKorwin v. First National Bank*, 318 F.2d 176, 179 (7th Cir. 1963) for the same proposition, but fails to realize that that case did not use the most significant relationships test which was clearly in use by the time of the 7th Circuit's decision in *Palmer*, supra.

Plaintiff, then, essentially asks the Court to base the choice of law decision solely on where he resides currently and on no other factor. Surely that is not the sole inquiry. The place of negotiation and execution of the contract also has to be considered, and the "contacts are to be evaluated according to their relative importance with respect to the particular issue." Restatement (2nd) of Conflicts § 188. The issue here is the meaning of the subsidiary rights clause. If Illinois and New York law turn out to be in conflict on this issue, surely the meaning of a clause of a contract cannot change merely because one party later moves to another part of the country. It seems to this Court that the meaning of the subsidiary rights clause ought to have the meaning that would have been understood and relied upon by the parties at the time they negotiated and executed the contract. In this case, since all parties lived in New York and all initial performances were to take place in New York, that meaning should be determined by New York law. See also *Bradley v. TNT Skypack, Inc.*, 983 F.Supp. 1147, 1149 (N.D. Ill. 1997) (where contract was executed, negotiated, and initially performed in New York, and all parties lived in New York at the time the contract was first performed, New York law governed).

## B.    New York Contract Interpretation

We now finally turn to the substantive issues of Counts II, III, and IV. The parties largely dispute specific aspects of the Books and the Play. Plaintiff contends that the Play contains dozens of plot elements, and, in some cases, near-verbatim accounts of events, very similar to those in the Books. Defendants dispute this and both sides have provided the Court with lengthy point-by-point comparisons. Such intense issues of disputed fact are most certainly best left to a jury, and therefore because a summary judgment analysis is performed with all possible factual inferences being resolved in favor of the non-moving party, the Court will assume, for purposes of Defendants' motion for summary judgment, that Plaintiff's analysis of the similarities of the Books to the Play is largely correct. Thus, we assume that the Books recount numerous stories, songs, and plot elements found in the Play, and in some cases describe these stories in a very similar way to that of the Play.

The heart of this case, then, surrounds interpretation of the subsidiary rights clause. This case presents the question of whether a writer, who bases a work partially on his life story, grants a producer subsidiary rights to that work (but not necessarily to his life story), and proceeds to create another work based on his life story, entirely different in character from the first, owes the producer of the first work subsidiary rights to the second work. The Court holds as a matter of law that he does not.

Under New York law, "the initial interpretation of a contract is a matter of law for the court to decide." *Alexander & Alexander Services, Inc. v. These Certain Underwriters at Llyod's, London, England,* 136 F.3d 82, 86 (2d Cir. 1998) (citing *K. Bell & Assoc., Inc. v. Lloyd's Underwriters,* 97 F.3d 632, 637 (2d Cir. 1996)). In interpreting a contract, if the court

finds the contract term to be unambiguous, it is to give the term its plain and ordinary meaning and interpret the contract without the aid of extrinsic evidence. *Id.*

A contract term is unambiguous when the words used have a "definite and precise meaning, unattended by danger of misconception ... and concerning which there is no reasonable basis for a difference of opinion." *Breed v. Insurance Co. of North America*, 385 N.E.2d 1280, 1282 (N.Y. 1978). An ambiguous contract, on the other hand, is one which is capable of "more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages, and terminology as generally understood in the particular trade or business." *Independent Energy Corp. v. Trigen Energy Corp.*, 944 F.Supp. 1184, 1191 (S.D.N.Y. 1996) (quoting *Eskimo Pie Corp. v. Whitelawn Dairies, Inc.*, 284 F.Supp. 987, 994 (S.D.N.Y. 1968)). A contract term is not made ambiguous merely because the parties urge different interpretations, or even when one of the parties strains the contract language beyond its reasonable and ordinary meaning. *Id.*

We agree with the Plaintiff that the subsidiary rights clause is unambiguous. We disagree, however, with Plaintiff's interpretation of that clause. The clause states: "Producer will be entitled to ... an aggregate share of 40% of the Play's subsidiary rights ... includ[ing], but not ... limited to worldwide rights, touring rights to the Play, stock and amateur, publication rights, merchandising, motion picture, cable and/or television rights, and record rights." The question is whether Angela's Ashes, 'Tis, and A Monk Swimming are covered by subsidiary rights to the Play. This contract deals with intellectual property, specifically copyrights. The only logical meaning to apply to "subsidiary rights" is the meaning that would always be applied to determine if one work or performance thereof is covered by the copyright of another work.

The obvious inquiry, then, is whether the Books are legally derivative of the Play in the copyright sense. If so, they would clearly be contemplated by subsidiary rights. If not, then the contract could not contemplate them because they are independent of the Play.

The owner of a copyright is given the exclusive right to, inter alia, reproduce copies of the work, prepare derivative works based upon the copyrighted work, distribute copies of the work to the public (i.e., publish), and to perform the work. 17 U.S.C. § 106. The subsidiary rights clause clearly contemplates performance, 17 U.S.C.§ 106(4) ("worldwide rights, touring rights to the Play, stock and amateur"), publication of the script, 17 U.S.C. § 106(1) ("publication rights"), and derivative use of the play, 17 U.S.C. § 106(2) ("merchandising, motion picture, cable and/or television rights, and record rights.") The dispute concerns only derivative uses of the play; no party is questioning Plaintiff's rights to royalties from publication of the script or worldwide touring of the play.

A work is not derivative unless it has been substantially copied from the prior copyrighted work. *Litchfield v. Spielberg*, 736 F.2d 1352, 1357 (9th Cir. 1984). In this case, the Play was derived from the life stories and experiences of Frank and Malachy McCourt. The Books were also derived from those life experiences. If a derivative work is not copied from a previous derivative work, but, rather, is created independently from the underlying work, that work does not infringe on the previous work. *Maljack Productions, Inc. v. UAV Corp.*, 964 F.Supp. 1416 (C.D. Cal. 1997) (citing Nimmer on Copyrights § 3.03); Cf. *Gracen v. Bradford Exchange*, 698 F.2d 300 (7th Cir. 1983) (illustrating Judge Posner's concern that creation of a work derivative of that in the public domain might potentially inhibit other authors from creating derivative works of the same public domain material).

While Frank formally began penning Angela's Ashes and 'Tis in the early 1990s, he had been writing these books his entire life, and he wrote them without reference to the Play, because "this story of [him] and [his] family is deeply embedded and burned in [his] brain, and it needed to be told." (Def.'s LR 56.1(a)(3) ¶ 25; Frank Dep. at 160). For decades, Frank had filled notebooks with essays, recollections, and stories of his life that eventually became the inspiration for his memoirs. (Def.'s LR 56.1(a)(3) ¶ 26; Frank Dep. at 16-19, 94-26, 151). Malachy also had been preparing his story, "writing, jotting down things, [for] quite a number of years." (Malachy Dep. at 10). Plaintiff does not dispute these facts but rather questions their relevance. However it is clear these facts are more than relevant – they are dispositive. They go to the heart of whether the McCourts based their memoirs on the Play, or on their own life experiences, independently of the play. In fact, Plaintiff has put forth no evidence to suggest that the McCourts based their memoirs on the Play itself, and not on their own life stories.

Plaintiff does point out the numerous elements common to the Play and the Books – scenes, particular happenings in the boys' childhoods, even, at times, using very similar descriptions of the stories in both the Play and the Books. One such scene that received some attention in the briefings was that of Frank's First Communion, at which he eventually vomited. However, that both Angela's Ashes and A Couple of Blaguards contain a memorable depiction of Frank's First Communion does not make Angela's Ashes derivative of A Couple of Blaguards any more than a film about the American Revolution containing a scene of the signing of the Declaration of Independence would be derivative of the musical 1776, which contains the same scene.

Plaintiff's arguments fail to see the logical and obvious difference between a book or movie based on a play, and a book or movie based on the same subject matter as a play. One

fine example of this is Andrew Lloyd Weber's Evita, which was first a Broadway musical and was later made into a motion picture. Evita told the story of Eva Peron, wife of the Argentinean dictator Juan Peron. Plaintiff would argue that the McCourts, in writing their memoirs, derived material from A Couple of Blaguards in the same way Lloyd Weber did with Evita when he made the movie. But, in reality, what the McCourts did would be more analogous to Lloyd Weber producing a non-musical, historical drama about Eva Peron. Obviously, both the musical and the historical drama would have largely similar accounts, such as the famous scene of Eva standing on the palace balcony, but they would still be legally independent of each other; subsidiary rights to one would not give rights to the other, unless it could be shown that original material from the play was lifted and used in the historical drama. Plaintiff cannot show that in this case.

Finally, Plaintiff would argue that even if all the above were true, the McCourts, in signing the production agreement, contracted away the rights to their life stories, which, of course, they are allowed to do. However, this Court cannot endorse the idea that granting rights to one incarnation of part of a life story automatically grants away rights to all conceivable tellings of that life story. One case that Plaintiff cites in support, *Bartsch v. Metro-Golden-Mayer, Inc.,* 391 F.2d 150 (2d Cir. 1968), held that a grant of rights to vend, license, and exhibit a motion picture also granted the rights to televise the motion picture because it was foreseeable at the time the contract was made that television rights would be valuable and that the licensee would want to exploit them. Thus, Plaintiff argues, because it was foreseeable that the life story of the McCourts would be valuable in book or movie form, the production agreement's interpretation should be expanded to cover that. But this incorrectly assumes that the subject matter of the production agreement was the McCourts' life story itself, and not merely the Play.

Certainly the subsidiary rights clause would include a motion picture version of A Couple of Blaguards, using roughly the same script. It would also unquestionably cover televising an on-stage performance of the play, or broadcasting the performance on the radio, or even selling an audio album of the play's performance. Those would be foreseeable interpretations as contemplated by Bartsch. The unknowing contracting away of one's entire life story, however, is not.

Therefore, without any more than a scintilla of evidence put forth by Plaintiff that the memoirs Angela's Ashes, 'Tis, and A Monk Swimming were derived from A Couple of Blaguards and not solely from the McCourts' life experiences, Defendants' motion for summary judgment on Counts II, III, and IV is granted. Plaintiff's motion for summary judgment on those counts is, therefore, necessarily denied.


## III.    Counterclaims

Defendants raise three counterclaims: breach of Plaintiff's written agreement to pay the McCourts royalties and fees generated by the Play, breach of Houlihan's oral agreement to pay the McCourts for performing in the Play, and unjust enrichment based on these underpayments. A fourth counterclaim, for recission of the contract, has been dropped by the defendants. (Pl.'s Exhibit S). Defendants are not moving for summary judgment on their counterclaims, so the Court need only consider now whether to grant summary judgment against Defendants, dismissing their counterclaims.

Plaintiff first argues that the two breach of contract counterclaims should be dismissed on the grounds of statute of limitations. Statute of limitations is a procedural bar, not a decision on the merits, and thus the statute of limitation to be used is generally that of the State in which the

District Court resides, in this case Illinois. See *Kalmich v. Bruno*, 553 F.2d 549, 553 (7th Cir. 1977). The Illinois statute of limitation for breach of written contract, 735 ILCS 5/13-206, is ten years from the date that the cause of action accrues, and for breach of an oral contract the statute provides for five years. 735 ILCS 5/13-205. However, the Illinois statute contains a savings clause, which allows counterclaims, which would otherwise be barred by limitations if they were pure claims, if they are counterclaims to a cause of action by the plaintiff that arose within the limitations period for the counterclaim. 735 ILCS 5/13-207. Plaintiff contends that 1987 was the first year money was owed him under the modified agreement for performances of the play, so this is the year that gives rise to his claim for an accounting. Defendants' counterclaims, on the other hand, arise in 1985, when Defendants claim Plaintiff first failed to make payments to them under both the oral and written agreements. These counterclaims clearly arise before Plaintiff's claims would potentially be barred under the statute, and, therefore, they are permissible. Further, even if Plaintiff's claims, themselves, are barred by the statute of limitations, as Defendants argue, Defendants' are not, because, under Illinois law, a Plaintiff who makes a claim, which is later dismissed, waives all statute of limitations defenses which might arise in response to counterclaims made by Defendants pursuant to 735 ILCS 5/13-207. *Cameron General Corp. v. Hafnia Holdings, Inc.*, 683 N.E.2d 1231 (Ill. App. 1st Dist. 1997); *Ogg v. City of Springfield*, 458 N.E.2d 1331 (Ill. App. 4th Dist. 1984).[2]

Plaintiff's other arguments against Defendants' counterclaims are merger and latches: 1) that these counterclaims were compulsive counterclaims which should have been raised in the previous action in 1986, and 2) that the 1986 settlement settles all such counterclaims, assuming they were somehow implicitly made in the 1986 lawsuit. Ignoring that New York has no

---

[2] Neither of the cited cases deals with situations in which the primary claim is itself dismissed on *statute of limitations* grounds. But neither those cases, nor the statute itself, seem to make a distinction, and neither party suggested such a distinction to this Court.

compulsory counterclaims, see N.Y.C.P.L.R. § 3019, *Mottler v. Mottler*, 457 N.E.2d 691, 692 (N.Y. 1983), and citing no legal authority for its second proposition, plaintiffs' arguments fail. Therefore, Plaintiff's motion for summary judgment on the counterclaims is denied.

However, the Court is now concerned about whether it continues to have jurisdiction over this case. Under Fed.R.Civ.P. 12(h)(3), whenever it appears that the Court lacks subject matter jurisdiction over the case, the Court may dismiss the action on its own motion. See 28 U.S.C. § 1332. Based on the Court's examination of the record, it appears doubtful that counterclaim damages will amount to more than $75,000.00

## CONCLUSION

For the reasons set forth above, Plaintiff's motion for summary judgment is granted as to Count I on liability only and denied as to Counts II, III and IV (#32-1). Defendants' cross motion for summary judgment as to Counts II, III, and IV of Plaintiff's complaint is granted. Plaintiff's motion for summary judgment regarding defendants' affirmative defenses and counterclaim is denied (#31-1). This case is scheduled for a settlement conference on August 19, 2000 at 2:00 p.m. in Chambers 1278. The parties are to refer Judge Guzman's website for more informations.

SO ORDERED:                     ENTERED. *July 23, 2002*

HON. RONALD A. GUZMAN
United States Judge

-17-